**IN THE UNTIED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**SPHINXIIIHOUSTON, LLC**

    **Plaintiff,**

**v.**                                                              **Case No.**

**WESTCHESTER SURPLUS LINES**
**INSURANCE COMPANY, a Georgia**                  **COMPLAINT**
**Corporation, CHUBB NATIONAL**
**INSURANCE COMPANY, and DOES 1**
**through 10, Inclusive,**

    **Defendants.**

---

Plaintiff, SphinxIIIHouston, LLC ("Sphinx"), on behalf of itself and all others similarly situated, files this class action Complaint for damages and declaratory judgment against Defendants, Westchester Surplus Lines Insurance Company ("Westchester"), Chubb National Insurance Company, ("Chubb") and DOES 1 through 10, alleging the following:

<u>**INTRODUCTION**</u>

1.    This is a class action complaint seeking redress for breach of contract and declaratory judgment arising out of the denial of Sphinx's claim of insurance coverage, and similar claims by all others similarly situated, under an insurance policy sold by Westchester to Sphinx and to members of the class.

2.    Critically, these policies became effective years after Westchester had knowledge that SARS-type viruses existed and could cause direct physical loss of or damage to property.

3.     Despite its knowledge, Westchester sold this insurance policy to Sphinx and other similarly situated businesses *without any virus or pandemic exclusion or limitation whatsoever* in exchange for a substantial premium, even though such exclusions are in use throughout the insurance industry.

4.     Yet, only months later, the novel virus, SARS-CoV-2, the causative agent for COVID-19, caused Sphinx and thousands of other restaurants and hospitality businesses to close their doors because of the physical loss of or damage to property caused by COVID-19 and as a consequence of myriad civil authority orders issued to protect the public against the dangerous conditions associated with that damage. When Sphinx made a claim under the policy, Westchester turned its back on Sphinx, refused to honor its contractual promises under the insurance policy, and denied coverage for Sphinx's substantial financial losses.

**THE PARTIES**

5.     Sphinx is a limited liability company organized under the laws of the State of Texas, registered to do business in the state of Texas, with its principal place of business at 110 Vintage Park Blvd., Houston, Texas.

6.     Sphinx does business as the Barcelona Restaurant and Lounge and is located in Houston, Texas.

7.     Westchester is incorporated under the laws of Georgia with a principal place of business at 11575 Great Oaks Way, Suite 200, Alpharetta, GA 30022. Westchester is a "surplus lines" insurer that issues insurance policies in the state of Texas and other states.

8.     Chubb is the U.S. subsidiary of Chubb Limited, a Swiss company. Chubb is a

provider of a wide range of insurance products including property and casualty, accident, life and health insurance including coverage for business interruption. Its parent, Chubb Limited, claims to be the largest publicly traded property and casualty company in the world.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2008, 28 U.S.C. § 1332(d) , Plaintiffs allege and believe this action occurs under the laws of the United States, and that there are:  i) 100 or more class members; ii) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; iii) at least one member of the plaintiff class is from a different state than the Defendant.

10.     This Court has personal jurisdiction over Defendants pursuant to Ch. 17, Subsection C of the Texas Civil Practice and Remedies Code and specifically, §17.402 because Plaintiff's claims arise out of, among other things, Defendants conducting, engaging in, and/or carrying on business in Texas; Defendant Chubb's maintenance of an office in Texas; Defendants breaching a contract in this state by failing to perform acts required by contract to be performed in this state; and Defendants contracting to insure property in Texas, including but not limited to the premises insured under the Policy. Defendants also purposefully availed themselves of the opportunity of conducting activities in the state of Texas by marketing their insurance policies and services within the state, and intentionally developing relationships with brokers, agents, and customers within the state to insure property within the state, all of which resulted in the policy at issue in this action.

11.     At all times material, Defendants engaged in substantial and not isolated activity on a continuous and systematic basis in the state of Texas, namely by issuing and selling insurance policies in Texas and by contracting to insure property located in Texas.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Sphinx's principal place of business is in this District, a substantial part of property that is subject of the

action is situated in this district, Defendant Chubb has an office in this District at 2 Riverway, Suite 900, Williams Tower, Houston, Texas, Defendant Westchester is authorized by Texas Department of Insurance to do business in the District and a substantial portion of the events and omissions giving rise to the claims and losses occurred within the District.

## FACTUAL ALLEGATIONS

13.     Sphinx is the 100% owner and operator of the Barcelona Restaurant and Lounge in Houston, Texas, which is a restaurant and lounge that serves Spanish/American fusion food and alcoholic beverages at 110 Vintage Park Blvd., Houston, Texas. Barcelona Restaurant provides dine-in service and is also a venue for events in a private room and upstairs bar that caters for private parties, company events, wedding receptions and birthday parties.     On Thursdays, Fridays and Saturdays the restaurant had DJ Music and dancing from 9:00 pm to 2:00 am.

14.     Barcelona Restaurant was opened in April of 2014 and conducted regular business from the current location since that date. Average monthly sales from August 16, 2019 through December 31, 2019 was $101,183.00, and income at that rate was continuing through the beginning of 2020.

15.     To protect its business and cash flow in the event of property loss and business interruption, Sphinx and thousands of other restaurants purchased a commercial property insurance policy from Westchester. *See* Policy No. FSF15018872001, attached as Exhibit A (the "Policy").

16.     Chubb is Westchester's parent company.   Under the Policy, Chubb is responsible for receiving and managing claims and loss notices, responding to questions about insurance coverage, and receiving process served on Westchester's designated agent, among other things.

17.     The Policy is a bilateral contract: Sphinx agreed to pay monthly premiums to Defendants in exchange for Defendants' promises of coverage for certain losses.

18.     Sphinx duly complied with its obligations under the Policy and paid the requisite premiums.

19.     The Policy insures against loss of business income and ensuing business interruption and extra expense, unless specifically excluded or limited in the Policy. During the Policy's term, the novel coronavirus, SARS-CoV-2, commonly referred to as COVID-19, swept the globe.  This type of coverage protects Sphinx against a loss of business income due to a suspension of the restaurant's operations.  Additionally, Defendants promised to pay expenses incurred to minimize the suspension of business.

19.     As of this filing, more than 134,000 Americans have died from COVID-19, according to the Centers for Disease Control and Prevention.

20.     According to scientists, COVID-19 has several modes of transmission, including person-to-person, transmission through water droplets in the air and transmission as a result of touching surfaces on which the virus has recently fallen. Presently there is increasing evidence that it may also be transmitted through the air. There may be other means of transmission which have not yet been determined precisely, as the virus is new and more is being learned about it on a daily basis.

21.     In an April 2, 2020 "Situation Report" released by the World Health Organization ("WHO"), it is reported that the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.[1,2]

---

[1]     https://www.who.int/docs/default-source/coronavirus/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2

22.     Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another individual.   Data from published studies provide evidence that COVID-19  is primarily transmitted from pre-symptomatic people or asymptomatic people  (who might have minor symptoms that are not recognized as being COVID symptoms at the time of transmission) to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[3]

23.     The incubation period for COVID-19 – the time between exposure to the virus (becoming infected) and symptom onset – averages 5-6 days; however, it can be up to 14 days.[4]

24.     During this period, also known as the "pre-symptomatic" period, some infected persons can be contagious. In other words, pre-symptomatic transmission can occur before the infected person shows any symptoms.[5]

25.     Not only is COVID-19 spread by human-to-human transfer, but the WHO has confirmed that the virus can live on contaminated objects or surfaces.[6]

26.     According to a study documented in the  *New England Journal of Medicine,* COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[7]

---

[2]  See also WHO Virtual Press Conference held June 8, 2020.   Transcript found at https://www.who.int/docs/default-source/coronaviruse/transcripts/who-audio-emergencies-coronavirus-press-conference-08jun2020.pdf?sfvrsn=f6fd460a_0
[3] See WHO April 2, 2020, Situation Report, *infra*.
[4] *Id.*
[5] *Id.*
[6]  See WHO March 26, 2020 Situation Report found at https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200326-sitrep-66-covid-19.pdf?sfvrsn=9e5b8b48_2
[7] https://www.nejm.org/doi/10.1056/NEJMc2004973

27.     All of these materials are used in Sphinx's daily food preparation and service.

28.     The study's results suggest that individuals could become infected with COVID- 19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.

29.     Another scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for up to nine days.[8]

30.     Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.

31.     Surfaces, once physically affected by COVID-19, are referred to as fomites.

32.     Fomites consist of both porous and nonporous surfaces or objects that can become contaminated with a virus and serve as vehicles in transmission.

33.     During and after illness, viruses are shed in large numbers in body secretions, including blood, feces, urine, saliva, and nasal fluid.

34.     Fomites become contaminated with virus by direct physical contact with bodily secretions or fluids, contact with soiled hands, contact with aerosolized virus (large droplet spread) released while talking, sneezing, coughing, or vomiting, or contact with airborne virus that settles after disturbance of a contaminated fomite (e.g., shaking a contaminated tablecloth).

---

[8] https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext

35. Once a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites.

36. On March 27, 2020, the Centers for Disease Control and Prevention ("CDC") released a report titled *"Public Health Responses to COVID-19 Outbreaks on Cruise Ships – Worldwide, February - March 2020."*[9]

37. The report details COVID-19 outbreaks on three different cruise ships, which caused more than 800 confirmed cases and 10 deaths.

38. Of the individuals tested, a high proportion were found to be asymptomatic.

39. Significantly, COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess, but before disinfection procedures.

40. The CDC notes that more studies are required to understand COVID-19 transmission, but the uncertainty has serious implications for food service safety.

41. In an effort to combat the virus and slow the spread of COVID-19, state and local governments imposed directives requiring residents to remain in their homes unless performing "essential" activities, like shopping for food, going to see a doctor, or getting fresh air ("Stay at Home Orders").

42. The Stay at Home Orders typically require businesses deemed "non-essential" to be closed and in-person work is not permitted.

43. However, even businesses classified as "essential" have been impacted by the pandemic.

---

[9] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm

44.     Stay at Home Orders remain in effect and have caused the suspension of both nonessential and essential businesses.

45.     Even in jurisdictions where Stay at Home Orders were not imposed, many jurisdictions ordered restaurants to close their dining areas and only permit take-out and/or delivery. Other jurisdictions limited on premises dining to a small percentage of the facility's occupancy.

46.     Sphinx was the subject of both Stay at Home Orders and orders prohibiting or limiting on premises dining.[10]

47.     Stay at Home Orders and restrictions on premises dining to prevent the transmission of COVID-19 have had a devastating effect on Sphinx's business.

48.     Beginning in March 2020, Sphinx, and many other restaurants were no longer permitted to operate their dining rooms and were restricted to carry out / delivery or were severely restricted in their operations.[11] Carry out, delivery services and restricted dining capacity are not commercially feasible for Sphinx and the vast majority of other restaurants that offer on premises dining, all of which were known to Westchester when it underwrote and agreed to insure Sphinx and similar on premise dining establishments.

49.     Sphinx and thousands of other restaurants have suffered direct physical loss of or damage to its property caused by COVID-19.  Upon information and belief, Defendants have failed to pay for similar losses and expenses by at least thousands of other insureds holding policies that are, in all material respects, identical.

50.     In fact, during Chubb's 2020 Q1 Earnings Call, Evan Greensberg, CEO of Chubb, publicly announced that Chubb will "have business interruptions losses where we

---

[10] See generally https://www.houstonchronicle.com/news/houston-texas/houston/article/New-York-LA-Chicago-order-bars-restaurants-to-15134459.php
[11] Id.

purposely provided coverage as opposed to where [Chubb] – **the vast majority where we did not provide coverage.**" (Emphasis added.)

51.     Greensberg continued, "[Business interruption] insurance doesn't cover COVID-19.  It covers and requires direct physical loss to a property . . . Now, lawyers and the trial bar will attempt to torture the language on the standard industry forms to try to prove something exists that actually doesn't exist and try to twist the intent when the intent is very clear and the industry will fight this tooth and nail."

~~52.~~     Likewise, property within one mile of Sphinx's insured location has Suffered direct physical loss of or damage to property, all caused by COVID-19.

53.     Westchester issued the Policy number FSF15018872 001, effective August 23, 2019 to August 23, 2020, to Sphinx.

54.     Under the Policy, Defendants promised to cover these losses and expenses, and are obligated to pay them.  But in blatant breach of their contractual obligations, Defendants have failed to pay for these losses and expenses.

55.     The Policy provides business income and extra expense insurance coverage for its designated premises. *See* Exhibit B, Commercial Property Declarations. Specifically, the Policy provides that Defendants "will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' "Upon information and belief, this is a form policy used by Defendants in insuring other restaurants.

56.     Specifically, the Policy covers: a) The direct physical loss of or damage to Sphinx's property; b) The actual loss of business income Sphinx sustains due to the necessary suspension of its operations, where the suspension is caused by direct physical

loss of or damage to Sphinx's property; c) Sphinx's extra expense to avoid or minimize the suspension of its business; d) The actual loss of business income Sphinx sustains and necessary extra expense caused by an action of civil authority that prohibits access to Sphinx's property; and e) The actual loss of business income Sphinx sustains due to the suspension of its operations, where the suspension is caused by direct physical loss or damage to property operated by others whom Sphinx depends upon to (i) deliver materials and services, (ii) accept Sphinx products and services, (iii) manufacture Sphinx products for delivery to customers; and (iv) attract customers to Sphinx's business.

57. "Suspension" means, among other things, a slowdown or cessation of the insured's business activities.

58. "Period of Restoration" means the period of time beginning 72 hours after physical loss or damage to the property and ending on the date when the property is repaired or the date when business is resumed at a new location, whichever is earlier.

59. Additionally, under the Policy, Defendants also promised to cover "Extended Business Income." This coverage requires Defendants to pay for loss of business income beyond the Period of Restoration under certain conditions.

60. Specifically, Defendants promised to pay for the actual loss of Business Income during the period that begins on the date that the insured property is repaired, and ends either 60 days thereafter or on the date when operations are restored to the level which would generate business income to normal levels, whichever is earlier.

61. In addition to promising to pay for loss of Business Income, under the Policy, Defendants also promised to pay for certain necessary "Extra Expense[s]." Extra

Expenses mean expenses that the policyholder incurs to, for example, minimize the suspension of business.

62.     The Policy also provides "Civil Authority" coverage.  Under this type of coverage, Defendants promised to pay for the loss of Business Income and Extra expenses that Sphinx sustained as a result of "action of civil authority that prohibits access to the described premises."

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

63.     The Civil Authority provision is an independent basis for business interruption coverage.  That is, it can be triggered even when the standard business interruption coverage is not.

64.     The Policy issued by Westchester is what is commonly referred to as an "all risks" policy meaning that all risks are covered by the terms of the policy unless specifically excluded. Consistent with the all risks nature of the policy, Defendants

specifically agreed to pay for all losses caused by "Covered Causes of Loss" defined as direct physical loss unless the loss is excluded or limited by the policy._

65.  The Policy does not contain a virus exclusion, even though Westchester could have included such an exclusion in the Policy.

66.  The Policy does not contain a pandemic exclusion, even though Westchester could have included such an exclusion in the Policy.

67.  In 2006, the Insurance Services Office ("ISO"), an insurance industry organization that develops standardized insurance policy programs and forms for use by insurers, drafted a form exclusion for losses "due to disease-causing agents such as viruses and bacteria."[12,13]

68.  In presenting the exclusion to state insurance regulators around the country, ISO explained: Disease-causing agents may render a product impure (change its quality or substance) or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

---

[12]  See ISO form CP 01 40 07 06, effective July 2006, found at https://www.uuinsurance.com/ShowPDF.php?number=BP+06+01+01+07.

[13]  That the ISO drafted a virus exclusion provision is further evidence that viruses cause physical loss. if viruses never cause physical loss in the first place, a virus exclusion would be completely unnecessary.

69. Even though the Policy contains other ISO forms, Westchester deliberately chose to not add ISO's virus exclusion endorsement.

70. The purpose of an insurance exclusion is to carve away coverage that an insurer is unwilling to insure. By failing to include a pandemic/virus exclusion, Westchester has expressly indicated its willingness to insure Sphinx for pandemic/virus coverage.

71. In other words, Westchester had the opportunity to use standard insurance industry forms or language to specifically exclude virus losses like those resulting from COVID-19 from coverage, but it chose not to do so. Accordingly, because the Policy is an all-risk policy and does not specifically exclude the losses that Plaintiff has suffered, those losses are covered.

72. In the United States, state and local governments have responded by issuing "social distancing", Stay at Home Orders and orders prohibiting or severely restricting restaurants from offering on premises dining. These actions were taken to limit the spread of COVID-19.

73. These orders were issued because of, among other things, the spread of COVID-19 and, in particular, the rampant transmission of the virus through human contact with affected property.

74. The orders also were issued because of, among other things, direct physical loss of or damage to property caused by or resulting from a Cause of Loss covered under the Policy.

75. The orders have operated to prohibit access to Sphinx's insured location and that of similarly situated restaurants, among other places.

76.     The prohibition of access is a result of loss of property and the dangerous physical conditions resulting from damage caused by the presence of the virus in the area.

77.     Effective March 24, 2020, the Governor of the state of Texas ordered the closure of all dining and congregation areas in restaurants. Similar orders were entered in most places within the United States causing severe economic harm to the restaurant and hospitality industry.

78.     Orders from various other civil authorities also have been issued, and continue to be issued and extended, prohibiting access to Sphinx's insured location. Even in areas where restaurants were allowed to resume normal operations, a resurgence of COVID-19 cases is now causing a second round of closures and restrictions.

79.     Even where restaurants are permitted to continue delivery and take-out operations, the pandemic has had a significant impact on business volume and practices.

80.     For example, restaurants have had to increase frequency of cleaning, restrict customers to less than the legal capacity of the restaurant, separate tables and seating by at least 6 feet, reduce operational hours, institute "no contact" food hand-off procedures, provide personal protective equipment to employees, and prohibit customers from entering their facilities.

81.     COVID-19 and the resulting governmental orders have caused and continue to cause Sphinx and other restaurants physical loss of or damage to property and business income losses.

82.     The presence of COVID-19 caused direct physical loss of and/or damage to the covered premises under the Policy by, among other things, damaging the property,

denying access to the property, preventing customers from physically occupying the property, causing the property to be physically uninhabitable by customers, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

83. The Civil Authority actions prohibiting public access to the covered premises and the surrounding area were issued in response to dangerous physical conditions and caused a suspension of business operations on the covered premises.

84. As a direct result of the presence of COVID-19, Sphinx has suffered a suspension of business operations, sustained losses of business income, and incurred extra expenses.

85. As a direct result of the Civil Authority actions, Sphinx has suffered a suspension of business operations, sustained losses of business income, and incurred extra expenses.

86. These losses and expenses have continued through the date of filing of this action.

87. These losses and expenses are not excluded from coverage under the Policy. As the Policy is an all-risk policy, and Sphinx has complied with its contractual obligations, Sphinx is entitled to payment for these losses and expenses.

88. These losses present an existential threat to a thriving business decades in the making and the loss of employment for Sphinx's employees.

89. Faced with a loss that Sphinx sought to insure in purchasing the insurance in question, Sphinx made a claim under the Policy.

90.     Sphinx made its claim to Westchester on March 19, 2020, and a subsequent claim on June 1, 2020, which are attached hereto as Exhibit "C" and incorporated herein by this reference.

91.     Westchester denied the initial claim on May 1, 2020, and again denied the subsequent claim.

92.     In its letter of denial, Westchester claimed that the cause of loss was not covered because it did not constitute "direct physical loss or damage" to Sphinx's property.[14] In fact, this was erroneous because Sphinx's exclusion from its property and inability to use it due to both COVID-19 and the Stay at Home orders constituted physical loss of the property and damage to the property. Moreover, Sphinx is informed and believes and thereupon alleges that the presence of COVID-19 in the area constituted damage to the property.

93.     Because COVID-19 is a covered loss and no exclusion applies, the Policy provides coverage for Sphinx's claim.

94.     In denying Sphinx's claim, Westchester failed to faithfully apply its own Policy language, failed to conduct a meaningful investigation, and failed to consider the facts relevant to Sphinx's claim against the Policy language.

95.     As a result of Westchester's wrongful denial and inadequate investigation, Sphinx has suffered and continues to suffer damages.

## CLASS ACTION ALLEGATIONS

---

[14] This is an erroneous argument as a "direct physical loss or damage" to property has been defined as "a distinct, demonstrable and physical alteration" of a property's structure.  *Gregory Packaging, Inc. v. Travelers Property Cas. Co. of America*, 2014 WL 6675934 (D.N.J. Nov. 25, 2014).   As set forth throughout this complaint, Sphinx and other restaurants throughout Texas have had to make distinct, demonstrable and physical alterations to their property as a result of COVID-19.

96.     The class claims all derive directly from a single course of conduct by Defendants: their systematic and uniform refusal to pay insureds for losses suffered due to the COVID-19 pandemic and the related actions taken by civil authorities to suspend business operations.

97.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2) and/or 23(b)(3), as well as (23(c)(4), of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

98.     Sphinx seeks to represent nationwide classes defined as:

    a.     All restaurants, bars and hospitality businesses that had Business Income coverage under a property insurance policy issued by Defendants that were offering dine in or on-premises dining and whose facilities were impacted by Stay at Home Order(s) issued by Civil Authorities, curtailment of hours, prohibition of on premises dining, restriction on occupancy, closure as a non-essential business, or similar government imposed restrictions necessitated by the COVID-19 pandemic, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge, accept as a covered loss, or pay for the covered loss (the "Business Income Coverage Class").

    b.     All restaurants, bars and hospitality businesses that had Civil Authority coverage under a property insurance policy issued by Defendants that were offering dine in or on-premises dining and whose facilities were impacted by Stay at Home Order(s) issued by Civil Authorities, curtailment of hours, prohibition of on premises dining, restriction on occupancy, closure as a non-essential business, or similar government imposed restrictions necessitated by the COVID-19 pandemic, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge, accept as a covered loss, or pay for the covered loss (the "Civil Authority Coverage Class").

c.      All restaurants, bars and hospitality businesses that had Extra Expense coverage under a property insurance policy issued by Defendants that were offering dine in or on-premises dining and whose facilities were impacted by Stay at Home Order(s) issued by Civil Authorities, curtailment of hours, prohibition of on premises dining, restriction on occupancy, closure as a non-essential business, or similar government imposed restrictions necessitated by the COVID-19 pandemic, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge, accept as a covered loss, or pay for the covered loss (the "Extra Expense Coverage Class").

99.      Plaintiff also brings certain of the claims, identified, on behalf of itself and a portion of the Class described as the Texas Subclass as follows:

a.      All restaurants, bars and hospitality businesses located in the State of Texas that had Business Income coverage under a property insurance policy issued by Defendants that were offering dine in or on-premises dining and whose facilities were impacted by Stay at Home Order(s) issued by Civil Authorities, curtailment of hours, prohibition of on premises dining, restriction on occupancy, closure as a non-essential business, or similar government imposed restrictions necessitated by the COVID-19 pandemic, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge, accept as a covered loss, or pay for the covered loss (the "Texas Business Income Coverage Subclass").

b.      All restaurants, bars and hospitality businesses located in the State of Texas that had Civil Authority coverage under a property insurance policy issued by Defendants that were offering dine in or on-premises dining and whose facilities were impacted by Stay at Home Order(s) issued by Civil Authorities, curtailment of hours, prohibition of on premises dining, restriction on occupancy, closure as a non-essential business, or similar government imposed restrictions necessitated by the COVID-19 pandemic, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge, accept as a covered loss, or pay for the covered loss (the "Texas Civil Authority Coverage Subclass").

c. All restaurants, bars and hospitality businesses located in the State of Texas that had Extra Expense coverage under a property insurance policy issued by Defendants that were offering dine in or on-premises dining and whose facilities were impacted by Stay at Home Order(s) issued by Civil Authorities, curtailment of hours, prohibition of on premises dining, restriction on occupancy, closure as a non-essential business, or similar government imposed restrictions necessitated by the COVID-19 pandemic, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge, accept as a covered loss, or pay for the covered loss (the "Texas Extra Expense Coverage Subclass").

100. The following individuals and entities are excluded from the proposed classes and subclasses (the "Classes"): (1) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and the current or former officers and directors of any of the foregoing; (2) persons who properly execute and file a timely request for exclusion from any of the Classes; (3) the legal representatives, successors or assigns of any such excluded persons; (4) class counsel and their employees and immediate family members; (5) court personnel assigned to this case and their immediate family members; (6) individuals and entities that did not timely file a claim for coverage under their policy; and (7) persons whose claims against Defendant have otherwise been fully and finally adjudicated and/or released.

101. Sphinx reserves the right to amend the Class definitions and to seek recovery on behalf of additional persons as warranted as additional facts are learned in further investigation and discovery.

102.    This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil procedure.

103.    On behalf of itself and the proposed Classes, Sphinx seek a declaration that the business interruption and civil authority provisions in Westchester's business income and extra expense insurance coverage requires that Defendants cover Sphinx and all members of the proposed Classes for their Business Interruption, Civil Authority and Extra Expense coverage in full, and an award of monetary damages to the class members, together with costs and reasonable attorneys' fees.

104.    Plaintiff and the members of the proposed Class were harmed by Defendants' acts in at many ways. Without limitation, Defendants caused severe economic harm to Plaintiff and the Class and deprived them of much needed operating capital during their time of need. Many restaurants and bars have never been closed for such an extensive period of time. Despite being forced to close their doors or severely curtail their operations, most of these businesses had to continue paying rent or mortgages, taxes, employees and for equipment[15].

**Numerosity and Ascertainability**

105.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The exact size of the Classes is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable.

106.    Defendant Westchester is a division of Chubb Limited which proclaims itself to be the world's largest publicly traded property and casualty insurer and a

---

[15] Businesses that accepted the government's Payroll Protection Program monies were compelled to maintain employment for their staff as a condition of the program. Failure to do so means the program payments are not forgiven.

component of the S&P 500. Chubb and its affiliates have over 30,000 employees. Defendant itself claims it is one of the largest and most diverse excess and surplus lines commercial property and casualty insurance underwriters in the United States.

107. On information and belief, Westchester has written surplus lines insurance policies to thousands of businesses across the nation. It specializes in surplus lines insurance for restaurants such as that owned by Plaintiff, restaurants, bars, hotels and other hospitality businesses.

108. The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Defendants or their agents' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Commonality**

109. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves many common questions of law and fact which predominate over any questions that may affect individual members of the proposed Classes.

110. Defendants' issued all-risk policies to all the members of each proposed Class in exchange for payment of premiums by the Class members.

111. Common questions for the proposed Class include, but are not necessarily limited to the following:

    a. Whether Plaintiff and the Class members have suffered a covered loss under the common policies issued to members of the Class;

b.      Whether Defendants wrongfully denied any claims arising out of the COVID-19 pandemic;

c.      Whether Defendants' Business Income coverage applies to a suspension of business caused by the COVID-19 pandemic and/or related actions of civil authorities taken in response to the COVID-19 pandemic;

d.      Whether Defendants' Civil Authority coverage applies to a suspension of business caused by the orders of local, municipal, city, county, state and/or federal government entities requiring the suspension of business during the COVID-19 pandemic;

e.      Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by the COVID-19 pandemic;

f.      Whether Defendants are obligated to provide coverage to Plaintiff and all Class members due to Defendants' failure to include a pandemic/virus exclusion in the property insurance policies at issue;

g.      Whether Defendants have breached their contracts of insurance through a blanket denial of all claims for business losses related to the COVID-19 pandemic;

h.      Whether Plaintiff and the Class members have been damaged as a result of Defendants' willful actions;

i.      Whether Plaintiff and the Class members are entitled to declaratory relief in the form of this Court holding that Business Income coverage exists under the property insurance policies at issue;

j.      Whether Plaintiff and the Class members are entitled to declaratory relief in the form of this Court holding that Civil Authority coverage exists under the property insurance policies at issue;

k.      Whether Plaintiff and the Class members are entitled to declaratory relief in the form of this Court holding that Extra Expense coverage exists under the property insurance policies at issue;

l.      Whether Defendants' deliberate and willful actions in refusing to provide coverage to Plaintiff and the Class members during this time of national crisis is tantamount to oppression, fraud or malice and, as a result, Defendants are obligated to pay punitive/exemplary damages for each intentional and fraudulent denial of coverage;

m.      Whether Plaintiff and the Texas Subclass members are entitled to relief under the Texas Insurance Code; and

n.      Whether Plaintiff and the Class members are entitled to an award of reasonable attorneys' fees, interest and costs.

**Typicality**

112.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the other members of the Class and arise from the same course of conduct by Defendants

113.    Plaintiff and the Class members are all similarly affected by Defendants' refusal to pay under their property insurance policies and, as a result,  sustained damages as a result of Defendant's uniform wrongful conduct during transactions with Plaintiff and the Class.

114.    Plaintiff's claims are based upon the same legal theories as those of the other Class members.

115.    The relief sought by Plaintiff is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

116.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions involving violations of state insurance statutes.

117.    Plaintiff has no interest antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

**Inconsistent Of Varying Adjudications And The Risk Of Impediments To Other Class Members' Interests.**

118.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) as Plaintiff seeks class-wide adjudication as to the interpretation and scope of Defendants' property insurance policies.  The prosecution of separate actions by individual members

of the proposed Classes would create an imminent risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

**Superiority**

119. This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given, among other things, that joinder of all parties is impracticable. Class wide relief is essential to compel Defendants to provide coverage to restaurants and bars who have been denied business interruption and civil authority coverage.

120. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions.

121. Even if members of the proposed Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies alleged herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured. Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate. Moreover, on information and belief, Plaintiff alleges that Defendant's failure to honor

the business interruption and civil authority provisions of its policies will likely continue in the future if declaratory relief is not entered.

## CAUSES OF ACTION

## COUNT I: DECLARATORY JUDGMENT
### (On behalf of the National and Texas Business Income Coverage Classes)

122.    Plaintiff re-adopts and re-alleges paragraphs 1 through 121 above.

123.    Plaintiff brings this Count individually and on behalf of the other members of the national and Texas Business Income Coverage Classes.

124.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

125.    Plaintiff's Policy, as well as the policies of other Business Income Coverage Classes members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

126.    In the Policy, Defendants promised to pay for losses of business income sustained as a result of perils not excluded under the Policy. Specifically, Defendants promised to pay for losses of business income sustained as a result of a suspension of business operations during the Period of Restoration.

127.    COVID-19 caused direct physical loss of and damage to Barcelona Restaurant and other Class members' insured premises, resulting in suspensions of business operations at these premises. These suspensions have caused Plaintiff and Class members to suffer losses of business income.

128.    These suspensions and losses triggered business income coverage under the Policy and other Class members' policies.

129.    Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

130.    Defendants, without justification, dispute that the Policy and other Class members' policies provide coverage for these losses.

131.    Plaintiff seeks a Declaratory Judgment that its Policy and other Class members' policies provide coverage for the losses of business income.

132.    An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Defendants' obligations to reimburse Plaintiff and other Class members for the full amount of these losses. Accordingly, the Declaratory Judgment sought is justiciable.

**WHEREFORE**, Plaintiff requests that this Court enter a Declaratory Judgment declaring that the Policy and other Class members' policies provide coverage for Class members' losses of business income.

## COUNT II: BREACH OF CONTRACT
### (On behalf of the National and Texas Business Income Coverage Classes)

133.    Plaintiff re-adopts and re-alleges paragraphs 1 through 121. above.

134.    Plaintiff brings this Count individually and on behalf of the other members of the national and Texas Business Income Coverage Classes.

135.    Plaintiff's Policy, as well as the policies of other Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

136.    In the Policy, Defendants promised to pay for losses of business income incurred as a result of perils not excluded under the Policy. Specifically, Defendants

promised to pay for losses of business income sustained as a result of a suspension of business operations during the Period of Restoration.

137.    COVID-19 caused direct physical loss of and damage to IT Italy Restaurant and other Class members' insured premises, resulting in suspensions of business operations at these premises. These suspensions have caused Class members to suffer losses of business income.

138.    These suspensions and losses triggered business income coverage under the Policy and other Class members' policies.

139.    Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

140.    Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

141.    As a result of Defendants' breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable.

**WHEREFORE**, Plaintiff, individually and on behalf of other Class Members, seeks compensatory damages resulting from Defendants' breaches of the Policy and other Class Members' policies and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III: DECLARATORY JUDGMENT
**(On behalf of the National and Texas Extra Expense Coverage Classes)**

142.    Plaintiff re-adopts and re-alleges paragraphs 1 through 121 above.

143. Plaintiff brings this Count individually and on behalf of the other members of the national and Texas Extra Expense Coverage Classes.

144. Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

145. Plaintiff's Policy, as well as the policies of other Extra Expense Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

146. Specifically, Defendants promised to pay for Extra Expenses incurred by Plaintiff and other Class members during the Period of Restoration that the insureds would not have incurred if there had been no loss or damage to the insured premises. These Extra Expenses include expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

147. COVID-19 caused direct physical loss of and damage to Barcelona Restaurant and other Class members' insured premises, resulting in suspensions of business operations at these premises. As a result, Plaintiff and other Class members have incurred Extra Expenses.

148. These Expenses triggered Extra Expense coverage under the Policy and other Class members' policies.

149. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

150. Defendants, without justification, dispute that the Policy and other Class members' policies provide coverage for these Extra Expenses.

151. Plaintiff, individually and on behalf of the other members of the Extra Expense Coverage Class, seeks a Declaratory Judgment that its Policy, and those of

other members of the Extra Expense Coverage Class, provides coverage for these Extra Expenses.

152.    An actual case or controversy exists regarding Class members' rights and Defendants' obligations under Class members' policies to reimburse Class members' for these Extra Expenses. Accordingly, the Declaratory Judgment sought is justiciable.

**WHEREFORE**, Plaintiff requests that this Court enter a Declaratory Judgment declaring that the Policy and other Class members' policies provide coverage for Class members' Extra Expenses.

## COUNT IV: BREACH OF CONTRACT
### (On behalf of the Extra Expense Coverage Class)

153.    Plaintiff re-adopts and re-alleges paragraphs 1 through 121 above.

154.    Plaintiff brings this Count individually and on behalf of the other members of the national and Texas Business Income Coverage Classes.

155.    Plaintiff's Policy, as well as the policies of other national or Texas Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

156.    Specifically, Defendants promised to pay for Extra Expenses incurred by Plaintiff and other Class members during the Period of Restoration that the insureds would not have incurred if there had been no loss or damage to the insured premises. These Extra Expenses include expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

157.    COVID-19 caused direct physical loss of and damage to the IT Italy Restaurant and other Class members' insured premises, resulting in suspensions of business operations at these premises. These suspensions have caused Class members to incur Extra Expenses.

158.    These Expenses triggered Extra Expense coverage under the Policy and other Class members' policies.

159.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

160.    Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these Extra Expenses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

161.    As a result of Defendants' breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable.

**WHEREFORE**, Plaintiff, individually and on behalf of other Class members, seeks compensatory damages resulting from Defendants' breaches of the Policy and other Class Members' policies and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT V: DECLARATORY JUDGMENT
### (On behalf of the Civil Authority Coverage Class)

162.    Plaintiff re-adopts and re-alleges paragraphs 1 through 121 above.

163.    Plaintiff brings this Count individually and on behalf of the other members of the Business Income Coverage Class.

164.    Under 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

165.    Plaintiff's Policy, as well as the policies of other Business Income Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

166.    In the Policy and other Class members' policies, Defendants promised to pay for losses of business income sustained and extra expenses incurred when, among other things, a Covered Cause of Loss causes damage to property near the insured premises, the civil authority prohibits access to property near the insured premises, and the civil authority action is taken in response to dangerous physical conditions.

167.    Plaintiff and other Class members have suffered losses and incurred expenses as a result of actions of civil authorities that prohibited access to insured premises under the Policy and Class members' policies.

168.    These losses satisfied all requirements to trigger Civil Authority coverage under the Policy and other Class members' policies.

169.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

170.    Defendants, without justification, dispute that the Policy provides coverage for these losses.

171.    Plaintiff seeks a Declaratory Judgment that its Policy and other Class members' policies provide coverage for the losses that Class members have sustained and extra expenses they have incurred caused by actions of civil authorities.

172.     An actual case or controversy exists regarding Class members' rights and Defendants' obligations under Class members' policies to reimburse Class members for these losses and extra expenses. Accordingly, the Declaratory Judgment sought is justiciable.

**WHEREFORE**, Plaintiff, individually and on behalf of other Class members, requests that this Court enter a Declaratory Judgment declaring that the Policy provides Civil Authority coverage for the losses and extra expenses incurred by Plaintiff and the other Class members.

## COUNT VI: BREACH OF CONTRACT
### (On behalf of the Nationwide and Texas Civil Authority Coverage Classes)

173.     Plaintiff re-adopts and re-alleges paragraphs 1 through 121 above.

174.     Plaintiff brings this Count individually and on behalf of the other members of the national and Texas Civil Authority Coverage Classes.

175.     Plaintiff's Policy, as well as the policies of other Civil Authority Coverage Class members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses and expenses covered by the Policy.

176.     In the Policy and other Class members' policies, Defendants promised to pay for losses of business income sustained and extra expenses incurred when a Covered Cause of Loss causes damage to property near the insured premises, the civil authority prohibits access to property near the insured premises, and the civil authority action is taken in response to dangerous physical conditions.

177.    Plaintiff and other Class members have suffered losses and incurred expenses as a result of actions of civil authorities that prohibited access to insured premises under the Policy and Class members' policies.

178.    These losses satisfied all requirements to trigger Civil Authority coverage under the Policy and other Class members' policies.

179.    Plaintiff and the other Class members have complied with all applicable provisions of the Policy, including payment of premiums.

180.    Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

181.    As a result of Defendants' breaches of the Policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable.

**WHEREFORE**, Plaintiff seeks compensatory damages resulting from Defendants' breaches of the Policy and other Class members' policies. and seek all other relief deemed appropriate by this Court, including attorneys' fees and costs

### COUNT VII: Texas Insurance Code Violations
### (On behalf of the Texas Subclasses)

182.    Plaintiff readopts and realleges paragraphs 1 through 121 above.

183.    At all times relevant to this complaint, Defendants were engaged in the business of insurance as defined by the Texas Insurance Code.

184.    Plaintiff brings this Count individually and on behalf of the other members of the Texas Business Income, Civil Authority and Extra Expense Subclasses.

185. Plaintiff's Policy, as well as the policies of other Texas Subclass members, are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses and expenses covered by the Policy.

186. All conditions precedent for Plaintiff to recover under the policy have been or will be met. In addition, as to any exclusion, condition, or defense pled by Defendants, Plaintiff can demonstrate that:

- The clear and unambiguous language of the Civil Authority, Business Interruption and Extra Expense policy provisions provide coverage for the damage and losses to the business as more fully described in Counts I through XI

- In the alternative, any other construction of the language of the policy is void as against public policy;

- Any other construction and its use by the Defendants violate the Texas Insurance Code section 541 et. seq. and is void as against public policy;

- Any other construction is otherwise void as against public policy, illegal, and violates state law and administrative rule and regulation.

- In the alternative, should the Court find any ambiguity in the policy, the rules of construction of such policy mandate the construction and interpretation urged by Plaintiff;

187. Plaintiff has suffered severe economic losses and other damages which have not been paid, even though the amounts are well-established.

188. The acts and omissions of the Defendants and their agents as alleged above constitute one or more violations of the Texas Insurance Code.

189. Defendants have failed to make an attempt to settle Plaintiff's claim in a fair manner, although its liability to the Plaintiff under the Policy is without dispute. This conduct is a violation of Tex. Ins. Code Sec. 541.060(a)(2)(A).

190.    Defendants have refused to fully compensate Plaintiff under the terms of the Policy and failed to conduct a reasonable investigation. Defendants performed an inadequate and outcome-oriented investigation of Plaintiff's loss which resulted in an unfair, biased and inequitable evaluation of Plaintiff's losses, with the purpose to create a false pretext for  Defendants to underpay or deny the covered loss. This conduct is a violation of Tex. Ins. Code Sec. 541.060(a)(7).

191.    Texas Insurance Code § 541.008 declares that Chapter 541 of the Code (Unfair or Deceptive Business Practices) is to be liberally construed to promote the purposes of the Chapter.

192.    Defendants have knowingly misrepresented to Plaintiff "pertinent facts" or policy provisions related to the business interruption and civil authority coverages at issue in violation of Texas Insurance Code § 542.003(b)(1) and 28 TAC § 21.203(1).

193.    Defendants failed to attempt in good faith to effect a prompt, fair, and equitable settlement of a claim submitted in which liability has become reasonably clear in violation of Texas Insurance Code § 542.003(b)(4) 28 TAC § 21.203(4).

194.    Defendants forced Plaintiff to file this suit by denying a covered claim and refusing to pay covered damages.   This conduct violates Texas Insurance Code § 542.003(b)(5) and 28 TAC § 21.203(5).

195.    Defendants have failed to meet its obligation under the Texas Insurance Code regarding payment of the claim without delay. This conduct is a violation of Tex. Ins. Code Sec. 542.058.

196. Texas Insurance Code § 542.054 declares that Chapter 542 of the Code (Processing and Settlement of Claims) is to be liberally construed to promote the prompt payment of claims.

197. Where statements were made by the Defendants, Plaintiff and members of the Texas subclasses reasonably relied upon them. As a result of the foregoing conduct, which was and is the producing cause(s) of injury and damage to Plaintiff, Plaintiff has suffered damages including, without limitation, actual damages, economic damages, and consequential damages. Moreover, one or more of the foregoing acts or omissions were "knowingly" made, entitling Plaintiff to seek treble damages pursuant to the Insurance Code. Insurance Defendant has also violated the Prompt Payment Act, and Plaintiff seeks 18% damages as a penalty, plus reasonable and necessary attorney's fees incurred as a result of these violations.

**REQUEST FOR RELIEF** **WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, as follows:

A. Entering an order certifying the proposed nationwide Classes and Texas Subclasses, designating Plaintiff as Class representative, and appointing Plaintiff's undersigned attorneys as Counsel for the classes;

B. Entering declaratory judgments on Counts I, III, and V in favor of Plaintiff and the members of the national and Texas Business Income Coverage Classes, Civil Authority Coverage Classes, and Extra Expense Coverage Classes as follows:

    i. Business Income, Civil Authority and Extra Expense losses and expenses incurred and sustained as a result of COVID-19 and related civil authority

actions are insured and covered losses and expenses under Plaintiff's and Class members' policies; and

ii. Defendants Westchester and Chubb are obligated to pay for the full amount of the Business Income, Civil Authority and Extra Expense losses and expenses sustained and incurred, and to be sustained and incurred, as a result of COVID-19 and related civil authority actions are insured and covered losses and expenses under Plaintiff and Class members' policies;

C. Entering judgments on counts II, IV, and VI in favor of Plaintiff and the members of the Business Income Coverage Class, Civil Authority Coverage Class, and Extra Expense Coverage Class; and awarding damages for breach of contract in an amount to be determined at trial;

D. Entering judgment on count VII in favor of Plaintiff and the members of the Texas Subclass and awarding statutory damages under the Texas Insurance Code and Prompt Payment Act including actual damages, consequential damages, treble damages, attorneys' fees, 18% damages (Prompt Payment Act), pre- and post-judgment interest, other litigation expenses and costs of court;

E. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs and attorneys' fees; and

G. Such other or further relief as may be appropriate.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all counts.

Dated: 13 August 2020

MAHANY LAW


By:____/s/_____
Brian H. Mahany
Bar Number # WI1065623
8112 W. Bluemound Road
P.O. Box 511328
Milwaukee, Wisconsin 53203
Office: (414) 258-2375
Direct: (414) 704-6731
Email: brian@mahanylaw.com

HOCHFELSEN & KANI


By:_____/s/_____
Steve Hochfelsen
*Pro hac forthcoming*
895 Dove Street #300
Newport Beach CA 92660
Office: (714) 907-0697
Email: steve@hockani.com